Stephen Evans
Plaintiff in *Propria Persona*
8140 Natures Way, Unit 11
Lakewood Ranch, Florida 34202
phone: 917-373-2232
email: evansstephend@gmail.com

RECEIVED
SDNY PRO SE OFFICE

2022 SEP 13  PM 3: 22

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF NEW YORK

U.S. Courthouse; 500 Pearl Street, New York, NY 10007

STEPHEN EVANS

    PLAINTIFF,

v.

NEW YORK CITY

DEPARTMENT OF

EDUCATION

    DEFENDANT.

CASE NO. _____

_____/

## COMPLAINT FOR DISCRIMINATION, RETALIATION, AND PROHIBITED ACTIONS ON THE BASIS OF DISABILITY

    Stephen Evans ("plaintiff"), sues the NEW YORK CITY DEPARTMENT OF EDUCATION ("defendant") for violations of the Americans with Disabilities Act and the Americans with Disabilities Amendments Act of 2008 (hereafter "ADA" and "ADA-AA", respectively), 42 U.S.C. §12101, *et seq.*, for discrimination, retaliation, and prohibited actions taken on the basis of disability under the "regarded as" and "record of" prongs in violation of the Americans with Disabilities Act of 1990 and the Americans with Disabilities Act Amendment Act of 2008 (hereafter "ADA" and "ADA-AA", respectively), 42 U.S.C. § 12101, *et seq.* Plaintiff petitions for declaratory and injunctive relief under Title I of the ADA as implemented under 29 CFR Part 1630, *et seq.*

## PARTIES

1.      The plaintiff resides in Lakewood Ranch, Florida at the address of 8140 Natures Way for all times material to the facts giving rise to the complaint.

2.      The defendant is an "employer" within the definition of 42 U.S.C. 12111(5), with their principal place of business at 345 E. 15th Street New York, NY 10003 for all times material to the facts giving rise to the complaint.

## JURISDICTION AND VENUE

3.      This court has original and exclusive jurisdiction over the plaintiff's claims pursuant to 28 U.S.C. §1331, in that the matters in controversy are brought pursuant to Title I of the ADA and ADA-AA of 2008; 42 U.S.C. §12101 and 42 U.S.C. §12112(a), (b) and (d)(4) as it pertains to "discrimination"; as implemented by 29 CFR Part 1630.14(b)(3), (c) and (d) as it pertains to adverse employment actions, employers and medical examinations and interventions.

4.      Venue is proper in this judicial district under 28 U.S.C. §1391 because the defendant does business in this judicial district and the acts complained of took place in this judicial district.

5.      The plaintiff timely filed a charge of discrimination against the defendant with the Equal Opportunity Employment Commission (EEOC) on September 16, 2021. The plaintiff has exhausted all administrative remedies and obtained his right to sue letter from the EEOC within the ninety days preceding the date on which he commenced his original complaint against the defendant. A true and correct copy of the EEOC's right to sue letter is alleged and included as Exhibit A.

6.      The plaintiff filed a Notice of claim upon the NYC DOE as required by §50 (f) prior to the commencement of a proceeding against this public corporation.

7.      The plaintiff has exhausted all administrative remedies available to him.

## BACKGROUND

1.      Since 2020, the defendant adopted measures known collectively as its "Covid-19 Policy", which included requirements or accommodations that employees wear surgical

masks, take experimental vaccines, practice isolation and segregation, submit to medical examinations, and disclose vital statistics as new conditions of employment.

2.     The defendant admits that its "Covid-19 Policy" is intended to prevent the spread of "Covid-19", which it describes as a deadly, contagious disease. The policy rests on the assumption that every employee, the plaintiff included, has or could have this disease. That is, the policy's underlying assumption is that all of its employees are simultaneously at risk and pose a risk to the health of all other employees. No provision exists in the policy to establish through individualized assessment whether a particular employee poses any direct threat to the health of their co-workers.

3.     The policy imposed mitigation measures developed by the Center for Disease Control and Prevention (CDC), largely recommended for an "over-65, immune-compromised" population.  The defendant's "Covid-19 policy" imposed these measures upon all of its workers without considering the individualized medical assessment of each employee's health or whether the policies were appropriate for the working population.

4.     Likewise, no provisions are in place which authorize the policy measures either by legal duty or by statute, thus the defendant's adoption of this policy is voluntary.  In the rush to implement the policy no oversight was given to provide the policy with any legal enforcement mechanism. The policy thus relies upon the voluntary compliance of employees waiving their rights to informed consent, to medical privacy, to refuse experimental medical treatments and to refuse non-job-related medical inquiries or treatments. A voluntary policy is not a legitimate requirement and cannot trigger compulsory termination.

5.     One of the mitigation measures established by the defendant's "Covid-19 policy" is a vaccination mandate. On the basis of compliance with this accommodation, the defendant's policy identified three types of employees: (1) vaccinated; (2) unvaccinated but with a medical or religious exemption; and (3) unvaccinated with no request for exemption.

6.     The defendant's policy treated the last group of employees (as opposed to the other employees that complied with the "Covid-19 Policy" or exempted themselves from it) either "as if" they carried a specific, active, infectious disease, or "as if" they had an impaired or

suppressed immune system that made them prone to contracting "Covid-19". The policy regarded them as disabled with a contagious disease.

7.      It should also be noted that no provisions were included in the policy to handle employees who did not volunteer to waive their rights and who claimed exception to the defendant's "Covid-19 policy".  The policy thus failed to acknowledge qualified individuals who claimed their rights under disability law and therefore are not subject to the policy or to the same requirements as the rest of the employees.

8.      The policy also asked representatives of the defendant to make repeated, non-job-related medical inquiries of employees and to impose non-job-related medical treatments on them.  Medical decisions are far beyond the scope of the employer-employee relationship.

9.      The plaintiff took exception to the policy partly because the practices were unrelated to the performance of his essential job functions[1]. The policy, as mentioned previously, lacked enforceability, and rather than allow employees to make their own medical decisions, the defendant chose to adopt and implement its "Covid-19 Policy" through obfuscation, coercion, retaliation and interference specifically towards the "unvaccinated" employees, such as the plaintiff.

10.     When the plaintiff, as a qualified individual, exercised his right under the ADA to refuse the accommodations imposed by the "Covid-19 Policy" and gave notice that the policy discriminated against him by perceiving him as having an un-assessed disability, the defendant denied him equal access to the premises and continued to impose these unrequested accommodations.

11.     The defendant also retaliated against the plaintiff by interfering with his rights, imposing punitive measures including isolation and medical examinations, barring him from the workplace, withholding his pay, and ultimately terminating his employment which was directly and proximately caused by his good faith refusal to participate in the defendant's "Covid-19 Policy".

---

[1] 29 CFR 1630.2(n)(2) definition "Essential Function": "(i) ….the reason the position exists is to perform that function."

**STATEMENT OF FACTS**

8.      The plaintiff was first employed by the defendant on January 31, 2007 as a high school math teacher. During the period between June of 2021 through August of 2021, the plaintiff and his colleagues were made aware of a newly adopted "Covid-19 policy" which told all employees to wear masks and to perform weekly self-examinations or to get "Covid-19 vaccinations" and enter their "vaccine status" on an online portal as a condition of employment.  The policy presumed that the plaintiff had "Covid-19" or that at some point in the future he might become infected with such a disease.

9.      On September 1, 2021, the defendant informed the plaintiff that he had until the deadline of September 27, 2021 to provide proof of "Covid-19 vaccination" as a new condition of employment or he would face termination.

10.     On September 8th, 2021, the plaintiff sent the defendant written notice that he was claiming his rights: to informed consent; to refuse experimental medical treatments; to refuse non-job-related medical inquiries or treatments; to be excluded from the policy based upon disability rights; to refuse a voluntary policy; and to work in an environment free of discrimination or retaliation for claiming his rights under the protection of the ADA.  Plaintiff also asked the defendant to produce any individualized assessment it was relying upon to consider him a "direct threat" to the health of others.   A true and correct copy of which is alleged as Exhibit A-7

11.     On September 10th, 2021 the plaintiff's Union President Mulgrew informed him that his employer refused to recognize the claims in his notice and would only allow him to apply for a "medical or religious exemption" to the policy. Thus, demonstrating the defendant's bad faith legal advice and instruction to the plaintiff as an attempt to violate the ADA by offering the plaintiff a decoy "right" to "request permission to be exempted from" a medical treatment for which there was no legal duty in the first place.

12.     Mulgrew also stated that if the plaintiff did not receive "Covid-19 vaccines" or a "medical or religious exemption" then he would either be fired, by being placed on "unpaid leave", or he would have to choose a severance option by Oct. 29th. This would be the direct cause of the termination of his employment, which constitutes an adverse employment action. A true and correct copy of which is alleged as Exhibit A-9.

**13.**    On September 13, 2021, Union Chapter Leader Sebastian Natera sent the plaintiff an email in which he openly speculated that the plaintiff could be infected with "Covid-19" and regarded all "unvaccinated" employees without "medical or religious exemptions" as carriers of disease and mentally unstable.   The email included the statement: "I'm pretty happy to know that those who ascribe to the pathological view that spreading disease is a civil right literally worth dying for can now be kept from being a danger to the school community." A true and correct copy of which is alleged as Exhibit A-11.

**14.**    As alleged in the plaintiff's affidavit, on September 13th, 2021, the plaintiff spoke with School Principal Robert Gentile on the phone about the discrimination and harassment he was was experiencing based upon being regarded as a direct threat by the policy. Plaintiff asked for assistance to return to work without harassment and gave notice to the principle that he was claiming his rights under the ADA and exclusion from the policy.  The principle told him to file a complaint and to come to work wearing a mask and to self-screen for "Covid-19".   The defendant did not acknowledge (1) its burden of proving that such measures were legally required, and (2) that plaintiff had rights that were protected under the ADA.

**15.**    On or about September 16th the plaintiff filed a charge of discrimination with the EEOC claiming that his employer had adopted a policy which regarded him as disabled with a contagious disease without any assessment.   Plaintiff claimed that his employer was making non-job-related medical inquiries and requiring non-job-related medical treatments as a condition of employment.   Plaintiff claimed that the employer's policy was not recognizing his right to refuse accommodations for a disability it perceived him as having and that his employer was also threatening to fire him as a result of claiming his rights. A true and correct copy of which is alleged as Exhibit A-12.

**16.**    As alleged in the plaintiff's affidavit, on September 17, 2021,  the defendant publicly removed the plaintiff from his classroom while he was actively teaching math to students. The defendant called in a NYPD "Safety Officer" and eventually escorted the plaintiff out of the building.  Plaintiff was informed that he was barred from entering the school for refusing accommodations (mask) of the "Covid-19 Policy".

17.     As alleged in the plaintiff's affidavit, on September 18, 2021, the plaintiff again tried to work but he was again barred by an NYPD "Safety Officer" and the assistant principal who escorted him out of the building because the plaintiff was not wearing a mask and was considered a direct threat by the defendant.  Plaintiff had $694.30 deducted from him pay for the two days he was barred from working. A true and correct copy of the pay stub is alleged as Exhibit A-13.

18.     On October 2, 2021, plaintiff was put on unpaid leave by his employer and ultimately, the defendant terminated the plaintiff's employment on February 11, 2022, for being "unvaccinated" as the plaintiff's testimony reveals, and as alleged herein.

19.     On November 29, 2021, the defendant attempted to conceal its illegal conduct as demonstrated by its efforts to persuade the plaintiff into signing an agreement waiving his rights to sue the defendant in exchange for keeping his health insurance until September 2022.  A true and correct copy is alleged as Exhibit A-14.

20.     This demonstrates that the defendant was fully aware of its illegal conduct and made attempts to conceal its violations by persuading the plaintiff to waive his rights to have any remedy for the defendant's violations, in exchange for a period of insurance benefits.

21.     On April 1, 2022 plaintiff was denied Unemployment Insurance benefits because the defendant falsely claimed that the plaintiff had voluntarily quit his job.   This further demonstrates that the defendant falsified employment records in an attempt to conceal its actions of terminating plaintiff's employment as the plaintiff's testimony reveals, and as alleged herein.

22.     Following this ordeal, the plaintiff obtained his right to sue letter from the EEOC and commenced the present complaint against the defendant.


## COUNT I. COMPLAINT FOR DISCRIMINATION IN VIOLATION OF THE ADA-AA

23.     Plaintiff re-alleges each of the foregoing statements and those in his affidavit, and incorporates each herein and further alleges that this is a case of first impressions.

24.     The defendant is a covered entity as defined under 42 U.S.C. §12111(5) of the ADA.

**25.** Disability cases typically involve plaintiffs who have assumed the burden of proof under the "actual" or "diagnosed" prong of the ADA; whereas, the plaintiff is proceeding under both the "regarded as" and the "record of" prongs of the ADA where the burden of proof is upon the defendant to prove that it qualified for an exemption or exception to their legal duties to comply with the ADA. These are further expressed in this complaint.

**26.** This is a case of "first impression" because the plaintiff has exercised his rights to medical privacy and informed consent to refuse the "Covid policy" medical treatments.

**27.** These rights are not limited merely to the "doctor-patient" relationship, but are squarely rooted in the ADA under 29 CFR Parts 1630.9(d), 1630.12(b), 1630.13(b) and Parts 1630(c) and (d) for the reason that these rights are <u>intangible private property rights of people</u>, and of the plaintiff specifically, and are protected by law and are not originated or granted by any statute. These rights existed long before any laws were adopted by modern society and in fact, have been exercised in the formation of modern society.

**28.** Plaintiff asks the question how can the "Covid policy" which is not authorized by any statute overcome established rights that form the bedrock of modern society?

**29.** This is also a case of "first impression" because the plaintiff, in using the ADA to protect his rights,  has asked the question: how did the defendant suddenly acquire a new legal authority or legal duty to treat the plaintiff, its employee, for a disease without any medical examination or diagnosis? The answer of course is that the defendant never did acquire any such legal duty or authority.

**30.** This is also a case of "first impression" because, while the defendant makes the noble-sounding but disingenuous claim that their "Covid-19 Policy" is intended to prevent the spread of "Covid-19", it has absolutely no financial responsibility to engage in or administer such a policy. In fact, employers may adopt a "Covid policy" for the entirely ulterior motive of qualifying for the government's disaster relief funds.

**31.** This case, for the first time, requires answers for the following questions: (1) Does the defendant have proof of any financial responsibility (insurance, etc.) to compensate anyone for becoming infected with "Covid-19" after complying with their "Covid-19 Policy"?; (2) Does the defendant have proof of any financial responsibility (insurance, etc.) to

compensate anyone for suffering any adverse health consequences as a result of complying with its "Covid-19 Policy"?

32.     This is additionally a case of "first impression" because, if the defendant actually had the novel and *bona fide* legal right to require the plaintiff to disclose his medical records, then the defendant would have the right to simply obtain the name and address of the plaintiff's physician and request such records directly from the physician. It is well-established that no physician would make such disclosure without the express written permission of the patient (plaintiff) or without a *bona fide* court order.

33.     Finally, it must be noted that an "exceptional condition" exists with this case which must be acknowledged.  If the United States District Court itself has adopted the same policies as the defendant, can the court be impartial?

34.     The defendant's "Covid-19 Policy" is a failed policy because it does not include several necessary provisions.

35.     It has no provisions for remaining compliant with disability law or addressing the needs of employees with disabilities.

36.     It has no provisions for protecting the medical privacy of employees, and specifically the plaintiff's.

37.     It lacks any authorized enforcement provisions and relies either on the plaintiff to voluntarily waive his rights to medical privacy, informed consent, and rights protected under the ADA **or** upon the defendant's willingness to force submission to the policy in exchange for disaster funding.

38.     The policy fails to provide any advice or instruction on how to conduct any individualized assessment[2]

39.     For those employees claiming rights under the ADA, the policy fails to identify that an ADA representative of the defendant will be necessary to oversee that the policy remains in compliance.

---

2    29 CFR 1630.2 (r) Individualized assessment shall include determining whether an individual would pose a direct threat, the factors to be considered include: the duration of the risk; the nature and severity of the potential harm; the likelihood that the potential harm will occur; and the imminence of the potential harm.

**40.**     In fact, the defendant's "Covid-19 Policy" completely ignores all legal duties to aid and encourage those with disabilities under the ADA.

**41.**     The defendant's "Covid-19 Policy" is applied in a discriminatory fashion by identifying distinct groups of employees, such as those who are "vaccinated" and those who are "unvaccinated" and treating them differently.

**42.**     The policy identifies one group of employees who claim to be exempted from the policy for medical or religious reasons but ignores the group of employees who invoke their rights under the ADA and are in a protected class.

**43.**     The defendant presumes that it "somehow" acquired the legal duty and legal authority to cure or treat the un-assessed disability by imposing the policy measures upon the plaintiff.

**44.**     The defendant claims that its "Covid-19 Policy" is a legitimate requirement, which authorizes termination for non-compliance, yet the defendant fails to act under any legal authority or legal duty to impose its policy measures on employees.  Simply claiming that a policy is "mandatory" or "required" does not automatically make it compulsory or legitimate.

**45.**     The plaintiff is regarded as having a disability by the defendant's "Covid-19 Policy", which, according to the defendant, was intended to prevent the spread of the contagious disease known as "Covid-19".

**46.**      Although the plaintiff is not required by law to discuss the nature of an un-assessed disability he was assumed to have, for clarity's sake he alleges that the defendant's policy rested on the assumption that every employee, the plaintiff included, had or could have this disease. That is, the policy's underlying assumption was that all of its employees were simultaneously at risk and also posed a risk to the health of all other employees.

**47.**     It is undisputed that the defendant openly admitted that the purpose of such policy was the prevention of the spread of "Covid-19".  The defendant's "Covid-19 Policy" regarded the plaintiff as having "Covid-19" or being prone to getting infected with "Covid-19".  All mitigation measures flowed from this premise; but the defendant terminated the plaintiff specifically for not being "vaccinated".

**48.**    It is not necessary to allege that the defendant's agents personally regarded the plaintiff as having a disability, the defendant's "Covid-19 Policy" clearly demonstrates that the defendant sought to impose the policy's provisions upon the plaintiff based upon the pure speculation, stereotype and generalization that he was infected or may in the future become infected with a deadly, contagious disease (e.g. "Covid-19").

**49.**    The defendant required non-job-related medical examinations of the plaintiff that were not consistent with any conceivable business necessity.

**50.**    The defendant made disability-related inquiries of the plaintiff that were not consistent with business necessity and not permitted under 29 CFR Part 1630.13(b)

**51.**    The defendant's "Covid-19 Policy" imposed certain non-job-related medical inquiries ("accommodations") on the plaintiff including, but not limited to: disclosing private medical records and medical history; and disclosing vital statistics, like body temperature, which are a diagnostic tool of physicians but are not a diagnosis in and of themselves.

**52.**    The defendant's "Covid-19 Policy" imposed submitting to medical tests[3] which are a diagnostic tool of physicians but are not a diagnosis in and of themselves.  This practice results in the absurd situation of relying upon a lay-man's "self-diagnosis" based upon interpreting one piece of data rather than upon a physician's professional finding.

**53.**    The defendant also assumes that its policy was the proper treatment to mitigate the effects of "Covid-19" in the workplace.  The defendant's "Covid-19 Policy" imposed certain non-job-related medical treatments including, but not limited to: taking experimental vaccines;  wearing a surgical mask over the face; engaging in "social distancing" which is a euphemism for quarantine and isolation.

**54.**    These medical treatments and medical inquiries are beyond the scope of the employee-employer relationship (contract) when they are non-job-related; in addition the defendant is trespassing on the plaintiff's medical privacy rights, both of these issues are expressed in the ADA.

---

[3]    "Covid 19 testing" results does not verify a diagnosis of being infected with "Covid", the test is designed to detect the presence of a coronavirus, of which there are many, including the common cold.  The tests also give many false positives when they are were not set to correct cycling according to instructions.

55.    In addition, if a vaccine prevents infection and transmission of a disease as defined by modern scientific standards, why would anyone need to take a vaccine so that someone else could avoid becoming ill? A vaccine protects the person taking it, and there is absolutely no scientific standard where any vaccine is taken to protect anyone else but the person taking it.

56.    The "vaccines" demanded by the defendant are experimental and have been given Emergency Use Authorization (EUA) and none of these experimental vaccines have been approved by the Food and Drug Administration, they have only been "authorized" for emergency use which means they are in clinical trial phase. The only "vaccine" that is FDA-approved, Comirnaty, is not commercially available, should the plaintiff choose to take it.

57.    The "Covid-19 policy" as implemented by the defendant asks un-skilled and unlicensed individuals to impose medical interventions upon employees because commentary on a website (e.g., CDC, EEOC, etc.) stated that such interventions might prevent a disease, even when these very websites disclaim such commentary as valid legal or medical advice.

58.    The defendant never provided notice of any kind to the plaintiff, advising the plaintiff as to the manner in which these medical treatments and medical inquiries were related to his essential job function. In fact, none of the accommodations were related to the plaintiff's essential job function because he was able to continue performing his essential employment duties without participating in the defendant's "Covid-19 Policy".

59.    The plaintiff also alleged in his testimony and in written communications[4] that he was both willing and able to continue performing his employment duties and that the defendant's "Covid-19 Policy" was not related in any way to his essential job functions and that the defendant failed to give conspicuous notice as to the manner in which such policies were related to the plaintiff's essential job functions.

60.    Furthermore, the defendant's policy violates 29 CFR §1630.14(c) of the ADA because it involves sharing non-job-related medical classifications (e.g. "vaccination status", vital statistics and "PCR"[5] medical examination history) without any regard to confidentiality.

---

4 A true and correct copy of which is alleged as Exhibit A-7.

5   Polymerase Chain Reaction

The policy includes no provision to preserve the medical privacy rights of any employee, including the plaintiff's.

61.    The defendant's policy purportedly requires employees to examine themselves, and then make a self-diagnosis[6] upon which the defendant intends to rely as if such diagnosis was obtained by a licensed, qualified professional physician.

62.    The defendant's policy does however require employees to obtain a physician's note if they are claiming some exemption to the policy for religious or medical reasons.

63.    Ironically, the defendant's "Covid-19 Policy" also impairs the plaintiff's ability to perform his essential job functions by imposing mitigation measures which create a physical impairment that substantially limits the plaintiff's ability to engage in one or more major life activities, such as working, communicating with others, caring for oneself, breathing, etc.

64.    The defendant refused to allow the plaintiff to continue working without first submitting to its discriminatory "Covid-19 Policy".

65.    The plaintiff is not required to request exemptions from the defendant's "Covid-19 Policy" for religious or medical reasons and in fact, is not required to request any accommodations or reasonable modifications regarding such policy because none of its provisions are related to his essential job function.

66.    Therefore the plaintiff had no duty to request any reasonable modification or accommodation to the defendant's "Covid-19 Policy"; however, the plaintiff was deceptively informed that he had to request a "religious or medical exemption".

67.    The defendant's policy did not impose any new legal duties upon the plaintiff from which he could have been exempted or needed to request exemption from.

68.    In fact this deceptive practice was only intended to give the appearance of fairness while the defendant could deny or revoke exemptions as it suited the defendant.   The defendant never disclosed the qualifying criteria for such an "exemption" nor disclosed the legal duty from which the plaintiff was being "exempted".

---

[6]   "Covid 19 testing" results does not verify a diagnosis of being infected with "Covid", the test it is designed to detect the presence of a coronavirus, of which there are many, including the common cold.  The tests also give many false positives when they are were not set to correct cycling according to instructions.

69.     The plaintiff is not required to discuss the nature of an un-assessed disability he is "assumed" to have; nor is he required to request any "reasonable modifications", for an un-assessed disability he is assumed to have.

70.     In actuality, the plaintiff was always protected under the ADA once he opposed the policy.   He is not required to use the language of the ADA to claim this protection, however the plaintiff did specifically give notice to the defendant that he was a qualified individual who was being regarded as having a disability by the defendant's policy.

71.     The defendant failed to conduct any individualized assessment establishing that the plaintiff's good faith refusal to participate in its "Covid-19 Policy" was a direct threat.

72.     The defendant simply punished the plaintiff for his refusal on the pure speculation that the plaintiff had a disability known as "Covid-19", or on the pure speculation that someday he might have such a disease, and on the false premise that the defendant had the legal duty and authority to protect him and everyone else from contracting such a disease (disability).

73.     Claiming that the plaintiff had a deadly contagious disease, or that he might someday become infected with such a disease, is not a defense to violating the ADA, specifically, 29 CFR Parts 1630.9(d), 1630.12(b), 1630.13(b) and Parts 1630(c) and (d).

74.     The defendant cannot rely upon news or public announcements to determine that the plaintiff individually poses a direct threat because the statute requires a *bona fide* medical examination and diagnosis by a physician.

75.     The "Covid-19 policy" does not include a provision for requiring an individualized assessment by a physician to determine whether the employee poses a direct threat in the first place yet it requires employees to obtain a note from their physician in order to qualify for a "medical exemption" to the policy.

76.     Is it rational to regard oneself and others as having an illness without any diagnosis, and then seek to treat everyone with the same medical intervention without any diagnosis? This behavior is defined as a mental illness in the Fifth Edition of the Diagnostic and Statistical Manual for Mental Health.[7] The "Covid-19 Policy" generates such irrational

_____
7    Factitious Disorder or Munchausen Syndrome by Proxy.

behavior from those seeking to impose that they act "as if" they are suffering from an un-diagnosed mental illness.

77.     The plaintiff is also entitled to the protections established in the ADA under the third prong which establishes coverage when others make a "record of" of an individual's disability.

78.     The defendant's "Covid-19 Policy" assumes that "unvaccinated" employees who do not have a medical or religious exemption are impaired by a contagious disease that affects their respiratory system and simultaneously assume that they are impaired by a suppressed or weak immune system that makes them vulnerable to "Covid-19".

79.     The defendant made a record of the impairment its policy is intended to treat, by documenting plaintiff's "vaccination status" (even though plaintiff refused to disclose his medical records) and via its communication, attitude and treatment of the plaintiff.

80.     The defendant mis-classified the plaintiff and made a record of impairment by imposing its policy upon the plaintiff without any diagnosis, but based upon pure speculation, generalization and stereotype.

81.     The defendant made a record of disability by classifying the plaintiff as an "unvaccinated" employee, and classifying him as needing to wear a mask and self-test which led to segregating and isolating him by excluding him from his classroom and then barring him from workplace and thus suffering the loss of his income.

82.     The mitigation measures imposed by defendant's "Covid-19 policy" also create physical impairments that substantially limits the plaintiff's ability to engage in one or more major life activities, including working, communicating and interacting with others.

83.     The defendant, by its own policies, attitude toward the plaintiff, written communications, method of record-keeping and general treatment of the plaintiff, created a set of facts that satisfy the criteria under the ADA's  "record of" disability prong.

84.     The defendant's "Covid-19 Policy" was not uniformly or universally applied to the plaintiff once the defendant began making a record of such disability by mis-classifying the plaintiff as having an impairment which needed to be treated or cured by the defendant's "Covid-19 Policy".

85.    Upon giving the defendant notice that he was regarded as having a disability,[8] the plaintiff identified himself as being within a protected group; upon claiming his rights to refuse the defendant's accommodations based upon his good faith opposition, he engaged in a protected activity.

86.    The defendant applied the policy to everyone equally and failed to recognize that the plaintiff 1.) opposed the policy, 2.) gave notice of being regarded as having a disability, 3.) objected to submitting to the defendant's "accommodations", and 4.) was within a protected class and engaged in a protected activity.

87.    The plaintiff therefore was not subject to the same "Covid-19 Policy" as everyone else who had not invoked their rights under the ADA. As an analogy: consider a defendant requiring a wheelchair-bound employee to use the stairs or face loss of income, title or employment termination because e*veryone is required to use the stairs and the policy is applied equally to everyone.*  It is clear that this is an erroneous conclusion that does not allow disability rights.

88.    Regarding each incident of the plaintiff's good faith refusal to accept defendant's "Covid-19 Policy" measures, and the defendant's adverse response, the plaintiff was in a protected class and engaged a protected activity, and was not required to participate in the defendant's policy under 29 CFR Part 1630.9(d), unless the defendant established an exemption or exception to its legal duty to comply with the ADA.

89.    The defendant failed to identify or describe any set of facts establishing that the plaintiff's good faith refusal to participate in the defendant's "Covid-19 Policy" would have created any undue financial hardship.

90.    The defendant failed to identify or describe any set of facts establishing that the plaintiff's good faith refusal to participate in the defendant's "Covid-19 Policy" would have fundamentally altered their normal operations. In fact, the defendant's policy itself already did in fact fundamentally alter their normal operations.

91.    The defendant required non-job-related medical examinations of the plaintiff that were not consistent with any conceivable business necessity.

---

[8] As a current employee he is, of course,  understood to be a "qualified individual".

92.    The defendant made disability-related inquiries of the plaintiff that were not consistent with business necessity and not permitted under 29 CFR Part 1630.13(b)

93.    The defendant failed to establish any set of facts that proved that its regarding the plaintiff as carrying the "Covid-19 disease" was transitory or minor.

94.    There is no established end-date when the defendant would cease regarding the plaintiff in need of mitigation.   The defendant cannot now claim that such disability is "transitory", especially since it is not acting upon any medical diagnosis, court order obtained by the Department of Health, or any individualized assessment establishing that the plaintiff individually is a direct threat.

95.    To this day, the defendant has failed to demonstrate that it met or satisfied any exemptions or exceptions to its *bona fide* legal duties under the ADA to aid and encourage those with disabilities, including the plaintiff.

96.    The plaintiff's allegations easily satisfy the elements of discrimination by showing that he falls within a protected group, that he is qualified for the position he held, that he was subject to adverse employment actions and that the adverse employment actions were taken under circumstances which constitute unlawful discrimination.

97.    The plaintiff demands a jury trial.

98.    WHEREFORE plaintiff demands injunctive relief, including but not limited to: (i) a judgment from this Court that defendant's actions were unlawful; (ii) back pay; (iii) compensatory damages in whatever amount he is found to be entitled; (iv) reinstatement, or in the alternative front pay in the event reinstatement is not practical; (v) an equal amount as liquidated damages, other monetary damages; (vi) an award of costs and reasonable court fees; and (vii) punitive damages to the extent available; (viii) pre-judgment and post-judgment interest; and (ix) a jury trial on all issues so triable, and for other relief deemed appropriate by this court.

## COUNT II – COMPLAINT FOR RETALIATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

99.    The plaintiff sues the defendant for retaliation in violation of the ADA and the ADA-AA.

**100.**   The plaintiff re-alleges the foregoing statements of fact and allegations from his complaint for discrimination in Count I along with his affidavit, and further alleges the following.

## ALLEGATIONS

**101.**   Upon giving defendant notice that he was regarded as having a disability and that he was a qualified individual with a disability, the defendant began retaliating against the plaintiff by imposing punitive measures and adverse employment actions, upon him for his good faith refusal to participate in the defendant's offered accommodations.

**102.**   The defendant's "Covid-19 Policy" depends solely upon getting the employee to voluntarily waive his rights to medical privacy and disclose such records through coercion and retaliation, any act by an employer designed to deter an employee from claiming their rights is an adverse employment action under the ADA and is prohibited by law.

**103.**   The defendant implemented a policy which regarded the plaintiff as disabled because of the plaintiff's unvaccinated status and when the plaintiff refused mitigation measures, the defendant responded with adverse employment actions.

**104.**   The defendant admits that refusing to disclose the plaintiff's "vaccination status" (i.e. medical records) would directly and causally result in the plaintiff's contract being either terminated or not renewed.

**105.**   Beginning from the moment he gave such notice to the defendant, the plaintiff suffered adverse employment actions[9] and the defendant continued attempting to impose its "Covid-19 Policy" upon the plaintiff.  Defendant ignored and denied his claim of disability, reprimanded him, on a daily basis, for refusing its accommodations as alleged in the plaintiff's affidavit, and finally, terminated his employment as alleged in his affidavit.

**106.**   Title 29 of Part 1630.12(b) prohibits employers from retaliating against employees, namely the plaintiff for exercising and enjoying his rights under the ADA,  specifically, "[i]t is unlawful to coerce, intimidate, threaten, harass or interfere with any individual in the exercise or enjoyment of, or because that individual aided or encouraged any other individual in the exercise of, any right granted or protected by this part."

[9] Under the ADA, adverse employment actions include any actions taken which interfere the with the plaintiff claiming their rights; which deter plaintiff from claiming their rights or which punish or retaliate against the plaintiff for claiming their rights.

**107.** The defendant retaliated by seeking to impose its "Covid-19 Policy" upon the plaintiff in violation of its *bona fide* legal duty of care under the ADA.

**108.** The defendant's "Covid-19 Policy" classified the plaintiff in such a way that his employment opportunities were adversely affected and limited because the defendant would not permit the plaintiff to do his job without first submitting to defendant's accommodations ("mitigation measures").

**109.** The defendant proceeded to segregate and isolate the plaintiff, by removing him from his classroom and barring him from the workplace which causally resulted in the plaintiff's loss of assignment (job opportunities) and the loss of his usual income.

**110.** The plaintiff exercised his right to refuse the defendant's Covid-19 Policy measures based upon a good faith belief that the policy did not apply to him because of the foregoing alleged failure of the defendant to establish any exemption or exception to its legal duty to comply with the ADA.

**111.** Exercising this right is a protected activity and the defendant's "Covid-19 Policy" was not equally or universally applied to the plaintiff because he had given notice of a disability and was therefore in a protected class and engaged in a protected activity.

**112.** The plaintiff exercised his right to refuse the defendant's policy measures based upon a good faith belief that the policy did not apply to him because the policy was not related in any way to his essential job function.

**113.** The plaintiff exercised his right to refuse the defendant's policy measures based upon a good faith belief that the policy did not apply to him because the defendant failed to give plaintiff conspicuous notice as the manner in which its policy was related in any way to his essential job function.

**114.** The defendant imposed pecuniary measures and other adverse employment actions upon plaintiff which included the loss or threatened loss of pay, isolation, segregation, diminished employment responsibilities, interference with his rights and the termination of his employment as alleged in his affidavit.

**115.** Each time the plaintiff exercised his right to refuse the defendant's accommodations, he did so in good faith, and the defendant subsequently, in a manner that was causally-

related to the exercise of such right, imposed adverse employment actions upon the plaintiff, including but not limited to threatening the plaintiff with suspension, dismissal, and the termination of his employment,  imposing pecuniary measures such as removing him from an active math class, docking his pay, and diminishing his responsibilities, for no necessary reasons other than to deter him and punish him for exercising his rights.

116.   The defendant imposed adverse employment actions upon the plaintiff which included, isolation and segregation, or sending him home so that he could not perform his essential job functions.

117.   The defendant imposed adverse employment actions upon the plaintiff, as alleged herein, when the plaintiff came for work and immediately was told "If you don't wear a mask, you can't come onto the property and begin working", thereby by reducing his hours in order to reduce his regular compensation.

118.   The defendant's "Covid-19 Policy", as alleged herein and described in more detail in the plaintiff's affidavit, describes a materially adverse change in the terms and conditions of employment, compared to the conditions of employment which existed prior to the defendant's implementation of it's "Covid-19 Policy".

119.   These changes did not simply create an inconvenience for the plaintiff, they substantially altered the manner in which he was able to do his job and interact with co-workers and students by substantially impairing his ability to perform his essential employment duties.

120.   The "Covid-19 Policy" is technically voluntary and yet the defendant imposed pecuniary measures and other adverse employment actions as a direct and proximate cause of the plaintiff's good faith refusal to participate or accept the provisions of the policy.

121.   These adverse employment actions included, but were not limited to, refusing to acknowledge the plaintiff's right to refuse non-job-related medical inquiries and interventions; identifying the plaintiff as "unvaccinated"; removing the plaintiff from a live classroom; denying the plaintiff entry to the workplace; reducing his compensation when he was barred; segregating and isolating him from his normal employment duties, diminishing his responsibilities, and ultimately terminating his employment.

**122.**   As a direct and proximate cause of plaintiff exercising his rights under the ADA to refuse in good faith the defendant's Covid-19 Policy measures, the defendant prevented the plaintiff from working on the premises, isolated him from other employees, caused him the loss of income by denying him access to job assignments, thereby diminishing his employment responsibilities and materially removing or reducing his benefits.

**123.**   Each of the foregoing adverse employment actions resulted from every effort the defendant undertook to coerce the plaintiff into submitting to its "Covid-19 Policy" accommodations, and each adverse employment action described herein was causally related to plaintiff's good faith refusal to comply with the defendant's policy.

**124.**   Each adverse employment action took place within moments of, or in direct response to, plaintiff's expression of his good faith refusal to comply with the defendant's policy.

**125.**   These facts demonstrate the defendant's adverse employment actions derived from the "Covid-19 Policy" and defendant' failure to comply with the ADA.

**126.**   This constituted a materially adverse change in the terms and conditions of employment.   Before the policy, the plaintiff and other employees were protected by disability law, medical privacy rights and the right to informed consent (which as explained previously are rooted in and protected by the ADA), the right to be heard, and the right to have a complaint for harassment heard impartially by the defendant, and after the defendant's adoption of its Covid-19 Policy, all of those rights were ignored and violated in a direct and causal response to the plaintiff's exercise of his right to refuse.

**127.**   These changes were not just "disruptive" or inconvenient; they were not merely limited to include a change in plaintiff's employment duties, such as working a different shift. These changes included (actual or likely) termination of employment, isolation, demotion, decrease in wages and loss of benefits and were each causally-related to each time the plaintiff chose to exercise and enjoy his rights under the ADA.

**128.**   Ultimately, the defendant did terminate the plaintiff's employment as a direct and proximate cause of his refusal to participate in the defendant's "Covid-19 Policy".

**129.**   The plaintiff was engaged in the protected activity of refusing in good faith to participate in its "Covid-19 Policy". The defendant was aware of plaintiff refusal from the

very moment he expressed that he was regarded as having a disability and began refusing to participate in the policy.

**130.**    Each time the defendant approached the plaintiff with a demand or request to submit to the terms of the "Covid-19 Policy", the defendant informed the plaintiff that he would be penalized, such as the plaintiff has previously alleged.

**131.**    Each time the plaintiff exercised his right to refuse, the defendant undertook adverse employment actions against the plaintiff as previously alleged, and in each instance, such measures were causally related to the incident of refusing the policy and suffering penalties or pecuniary measures imposed by the defendant and each of these are detailed in the foregoing allegations.

**132.**    The plaintiff demands a jury trial.

**133.**    WHEREFORE the plaintiff demands injunctive relief, including but not limited to: (i) a judgment from this Court that defendant's actions were unlawful; (ii) back pay; (iii) compensatory damages in whatever amount he is found to be entitled; (iv) reinstatement, or in the alternative front pay in the event reinstatement is not practical; (v) an equal amount as liquidated damages, other monetary damages; (vi) an award of costs and reasonable court fees; and (vii) punitive damages to the extent available; (viii) pre-judgment and post-judgment interest; and (ix) a jury trial on all issues so triable, and for other relief deemed appropriate by this court.

DATED this 3rd day of September, 2022.

Stephen Evans,
Plaintiff in *propria persona*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A

written communications

A-1



**Department of Health & Mental Hygiene** | **Department of Education**

June 24, 2021

Dear Colleagues,

Thank you for all that you continue to do to support and educate NYC's children during this unprecedented time. We recognize that the COVID-19 public health emergency has presented numerous challenges. You have met those challenges with dedication and flexibility, and we want to make sure you have every tool you need to keep you and your communities safe. One of the most powerful tools we have to end this pandemic is the COVID-19 vaccine.

As we look toward a return to school buildings for every student this fall, it is important to spread the word that everyone age 12 and older is eligible to get vaccinated. All of the vaccines available in the U.S. authorization by the Food and Drug Administration have been shown to be safe and extremely effective at preventing serious illness and death from COVID-19. Vaccines help us develop immunity without disease.

You can help instill confidence in your students, colleagues and community by sharing your story about why you got vaccinated or passing on the facts about the vaccines. If you have not been vaccinated yet, we encourage you to get a COVID-19 vaccine and set an important example. We know there are New Yorkers who still have questions or concerns, and we are dedicated to addressing them. The NYC Department of Health and Mental Hygiene has a number of resources with information:

- COVID-19: Vaccine webpage: includes the latest information on the COVID-19 vaccines (such as how to find a vaccination site, vaccine eligibility and what you can do once fully vaccinated)
- COVID-19: Vaccine Facts webpage: includes information on common issues and questions about the vaccines
- Frequently Asked Questions about COVID-19 Vaccines for Families and Educators
- Understanding the COVID-19 Vaccines
- Videos
  - Doctors of the NYC Department of Health PSA on COVID-19 vaccines
  - Community Providers on COVID-19 vaccines
  - Pregnancy, Nursing and Fertility

Vaccines are essential to stopping this pandemic. When you support COVID-19 vaccination, you help to protect your school and your community against COVID-19.

For more information about COVID-19 vaccines, visit nyc.gov/covidvaccine or call **311**. To find out where you or your loved ones can get vaccinated, visit nyc.gov/vaccinefinder or call 877-VAX-4NYC (877-829-4692). You can also sign up by visiting nyc.gov/homebound or calling 877-VAX-4NYC for an in-home vaccination.

Thank you for all you do, and have a great end to the school year.

Sincerely,

Meisha Porter
Chancellor
Department of Education

Dave A. Chokshi, MD, MSc
Commissioner
Department of Health and Mental Hygiene

**Mayor's Announcement re: vaccination requirements for City employees**

A-2

Chancellor Meisha Porter <NYCChancellor@schools.nyc.gov>
Mon 7/26/2021 7:04 PM
To: Chancellor Meisha Porter <NYCChancellor@schools.nyc.gov>

Dear Colleagues,

I hope this summer is treating you well! As we begin to gear up for the 2021-22 school year, I hope you're all getting time to restore before heading into our year of homecoming.

This morning, the Mayor made an important announcement about health and safety requirements for all City workers, which includes all DOE employees. Effective September 13, 2021, all DOE employees must have proof they are vaccinated for COVID-19 or, if not vaccinated, be tested for COVID-19 on a weekly basis.  Employees who have received at least one dose of the COVID-19 vaccine by September 13th will not have to submit weekly test results while they complete their full vaccination.

We encourage all staff who have not completed their COVID-19 vaccination to do so as soon as possible. More information about locations where New Yorkers can receive a vaccine for COVID-19 can be found at vaccinefinder.nyc.gov. To be fully vaccinated by September 13, employees would need to receive the following vaccines by these dates:

- Moderna: first dose by August 2
- Pfizer: first dose by August 9
- Johnson & Johnson: single dose by August 30

The City is also reinforcing its current mask guidance for City workers. Unvaccinated employees must wear a mask indoors at their worksite, while vaccinated City employees who do not interact with the public are currently not required to wear masks at their workstations, though they may choose to continue to do so. City workers who interact with the public including students and their families, must continue to wear masks at all times regardless of vaccination status. In addition, all employees must still wear a face covering when entering the buildings, travelling to their workspace, and in elevators.

We will continue to share updates on health and safety policies and protocols for schools as well as borough and central offices leading up to the first day of school. Thank you for all you are doing to keep yourself, your loved ones, your colleagues and the students you serve safe.

In partnership,
Meisha

**DOE Vaccination Portal**                                                    $A-3$

Division of Human Resources <DHR@schools.nyc.gov>
Thu 8/12/2021 11:31 AM
To: Division of Human Resources <DHR@schools.nyc.gov>

Dear Colleagues,

Recently, Mayor de Blasio announced that as of September 13, 2021, all City employees, including DOE employees, are required to provide proof of COVID-19 vaccination or a negative COVID-19 test once every seven days. Employees who have received at least one dose of the COVID-19 vaccine by September 13 will not have to submit weekly test results. (Employees who have one dose but who are not fully vaccinated by September 13 will still be expected to update their records when fully vaccinated to continue to be exempt from the weekly testing requirement.)

**In order to be exempt from the weekly testing requirement, you must submit proof of vaccination using the DOE's Vaccination Portal, here:** https://vaccine.schools.nyc/. For more information and updates, visit the COVID-19 Vaccination Portal page on the DOE InfoHub.

The Vaccination Portal allows you to provide the DOE your vaccination status and to upload proof of vaccination, which can be an image of your vaccination card, NYS Excelsior Pass, or other government record. Submitting this information will support New York City's pandemic response and recovery efforts, and help ensure that the DOE is a safe place to work for all employees.

The portal will also be enhanced to allow staff who do not submit proof of vaccination to submit the required weekly COVID-19 test results. More details regarding the weekly COVID testing requirement will be shared prior to September 13.

The privacy and security of your information will be protected by technical, physical, and administrative safeguards, including encryption. This information will be kept confidential in accordance with federal, state, and local laws. If you encounter technical issues using the Vaccination Portal, please contact the DOE Help Desk by opening a ticket online or calling 718-935-5100.

For more information about where to get vaccinated, visit vaccinefinder.nyc.gov or call 877-VAX-4-NYC. For more information on where to get tested, visit https://www.nychealthandhospitals.org/covid-19-testing-sites/.

Sincerely,

NYCDOE Division of Human Capital

A-4


**From: Michael Mulgrew, UFT President** noreply@uftmail.org
**Subject:** DOE vaccine mandate
**Date:** August 23, 2021 at 12:46 PM
**To:** mistersevans@gmail.com

View Online

Your Rights     Your Benefits     **Your Union**

Dear Stephen,

On Aug. 23, the mayor announced that the city is mandating the COVID-19 vaccine for all DOE employees as part of a public health intervention. Employees must have proof of the first shot of the vaccine by Sept. 27. This announcement is the first of several announcements we believe are to come about city employees being mandated for the vaccine.

With the Delta variant continuing to spread and Pfizer just announcing the full FDA approval of its vaccine, the city believes that those eligible for the vaccine must do their part to help keep our children safe.

As a union, our first priority has been keeping our kids and members safe and the schools open. New York City public school educators have led the way on this issue, with the great majority already vaccinated. We estimate that close to 80 percent of our membership is already vaccinated, so we know that as a union we have already done our part to help the city to beat this virus and protect our schools.

This decision is not up to the union. However, while the mayor is asserting his legal authority to mandate the vaccine for city employees, by law the details of this mandate must be negotiated with the UFT and other unions, and if necessary resolved by arbitration.

Religious and medical exemptions to vaccine mandates are in place in existing laws, yet we know there are other nuances and details of this mandate that will need to be worked out. Therefore, we have informed the city that we would begin impact bargaining on the issues. We will keep you informed on the details as they become available.

Sincerely,

Michael Mulgrew
UFT President

United Federation of Teachers
*A Union of Professionals*
52 Broadway, New York, NY 10004


This email was sent to: mistersevans@gmail.com

Preferences   |   Unsubscribe   |   Privacy Policy

©2021 United Federation of Teachers All Rights Reserved

A-5

**From:** UFT President Michael Mulgrew noreply@uftmail.org
**Subject:** Safety protocols for the coming school year
**Date:** August 26, 2021 at 9:35 PM
**To:** mistersevans@gmail.com



View Online

Your Rights      Your Benefits      **Your Union**

Dear Stephen,

The city today released its full health and safety plan for the 2021-22 school year, which builds on the strategies we used successfully last school year to keep our school communities safe.

Health and safety continues to be our top priority. We have been working with city and DOE officials throughout the summer to ensure that our members and our students remain safe when schools fully reopen in September amid the pandemic.

New York City schools will follow similar health and safety protocols as last school year on cleaning, ventilation, masks and personal protective equipment, and daily health screening.

Here are highlights of other features of the plan:

## Physical distancing in schools

The DOE will follow the CDC recommendation to maintain at least 3 feet between students within classrooms. When it is not possible to maintain 3 feet in a given school, the DOE advises layering multiple other prevention strategies. During meal service, schools will use outdoor spaces and additional spaces in school buildings where possible.

## COVID-19 testing in schools

Every school will have 10 percent of unvaccinated individuals who have submitted consent for testing in their school population tested biweekly. Students and staff who are fully vaccinated are not required to be tested.

## Positive cases of COVID-19 in schools

**Elementary Schools:** If there is a positive case in a classroom, all students in the

~~Elementary Schools.~~ If there is a positive case in a classroom, all students in the class will be instructed to quarantine for 10 calendar days.

**Middle and High Schools:** In the event there is a positive case in a classroom, students who are:

- At least 12 years old, vaccinated and not showing symptoms will continue to attend school in-person.
- At least 12 years old, vaccinated and showing symptoms will be directed to quarantine for 10 calendar days.
- Unvaccinated will be directed to quarantine for 10 calendar days. Those students who test negative on Day 5 of their quarantine can return to school on Day 7.

## Remote Instruction

The mayor has finally acknowledged the need for virtual instruction for medically fragile children and for those in quarantine, something we have maintained was necessary since last spring.

We are still working out the details of this remote instruction and other challenging aspects of the safety protocols, and we will continue to push for acceptable solutions to these issues at the bargaining table.

See the full plan

Starting Aug. 31, we will train the COVID-19 building response team in every school to ensure all protocols and procedures are being followed correctly. We will be reaching out to chapter leaders with more details next week. More than 3,000 UFT members benefited from this training last fall.

## Update on the vaccine mandate

We are moving ahead with impact bargaining with the city on its new vaccine mandate for DOE employees. While the UFT is a proponent of the vaccine, and we know an overwhelming majority of our members have already been vaccinated, we have a duty to make sure that the city's mandate is implemented correctly and legally.

In impact bargaining, we will ensure that the city respects our members' rights by

law and the DOE-UFT contract as it implements the mandate. We will be working at the bargaining table to ensure a fair and equitable process for medical and religious exemptions, an independent review and appeal process for members who are denied an exemption, and an appropriate outcome for members who decline to be vaccinated.

The Municipal Labor Committee is weighing a lawsuit challenging the city Department of Health's authority to mandate the vaccine. Although our attorneys believe the mandate has a strong legal foundation, as part of the MLC, we support its effort to ensure that every detail of this mandate meets the relevant legal standards.

We know you still have questions as you prepare for the opening day of school in September. We will continue to update you on the latest developments. I hope you are able to attend our next all-member town hall on Thursday, Sept. 2, where I will report on these topics and more.

Sincerely,

Michael Mulgrew
UFT President

United Federation of Teachers
*A Union of Professionals*
52 Broadway, New York, NY 10004

This email was sent to: mistersevans@gmail.com

Preferences  |  Unsubscribe  |  Privacy Policy

©2021 United Federation of Teachers All Rights Reserved

## Reminder: Vaccination Requirement as of 9/27

A-6

Division of Human Resources <DHR@schools.nyc.gov>
Wed 9/1/2021 2:23 PM
To: Division of Human Resources <DHR@schools.nyc.gov>

Dear Colleagues,

As we begin the new school year, and as office staff prepare for a return to working full time in DOE buildings, we want to remind you that all DOE employees are required to have received to have at least one dose of a COVID-19 vaccine by September 27. As an additional health and safety measure, all DOE staff and contractors will be required to wear face coverings at all times in DOE buildings, including administrative office buildings, except while eating or drinking.

You must use the DOE's Vaccination Portal to upload your proof of vaccination no later than September 27. Proof of vaccination can be an image of your vaccination card, NYS Excelsior Pass, or other government record. This information will be kept confidential in accordance with federal, state, and local laws. If you encounter technical issues using the Vaccination Portal, please contact the DOE Help Desk by opening a ticket online or by calling 718-935-5100.

Additionally, we are pleased to announce that during the first week of school the DOE will be hosting vaccination sites in every school with students aged 12 or older—approximately 700 locations. DOE employees can also make use of vaccination sites in our Central and borough offices—details are below:

65 Court Street, Brooklyn – K801
Dates: September 2,3 and September 9,10
Hours: 10 a.m.-5 p.m.
Interior: Room 101

44-36 Vernon Blvd – Q801
Dates: September 2,3 and September 9,10
Hours: 10 a.m.-5 p.m.
Interior: Room 501

52 Chambers Street, Manhattan – M860
Dates: September 2,3 and September 9,10
Hours: 12-5 p.m.
Exterior: Mobile Bus

Region 2 ROC B – 1230 Zerega Avenue, Bronx – X833
Dates: September 2,3 and September 9,10
Hours: 12-5 p.m.
Exterior: Mobile Bus

Petrides Complex Building A – 715 Ocean Terrace, SI – R080
Dates: September 2,3 and September 9,10
Hours: 12-5 p.m.
Interior: Petrides A Bldg

Thank you,

NYCDOE Division of Human Capital

A-7

Stephen Donald Evans
90 Beekman Street, #6C
New York, NY 10038

---

**Kelly McGuire**
New York City Department of Education
333 Seventh Ave.
New York, NY 10001
212-356-3739

# CONFIDENTIAL COMMUNICATION
### 29 CFR §1630.14(c)(1)

September 8th, 2021

RE       employment discrimination

Hello Kelly,

This is a confidential communication that I am requesting be included into my personnel file and I want this and subsequent communications to be kept confidential within human resources. **It is the policy of the Department of Education of the City of New York to provide equal employment opportunities without regard to actual or perceived race, color, religion, creed, ethnicity, national origin, alienage, citizenship status, age, marital status, partnership status, disability, sexual orientation, gender (sex), military status, unemployment status, caregiver status, consumer credit history, prior record of arrest or conviction (except as permitted by law), predisposing genetic characteristics, or status as a victim of domestic violence, sexual offenses and stalking, and to maintain an environment free of harassment on any of the above-noted grounds, including sexual harassment or retaliation.**

I am documenting acts of retaliation and harassment of which I have been subjected to on the job. **It is the policy of the New York City Department of Education to provide equal educational opportunities without regard to actual or perceived race, color, religion, creed, ethnicity, national origin, alienage, citizenship status, disability, sexual orientation, gender (sex), or weight and to maintain an environment free of harassment on the basis of any of these grounds, including sexual harassment or retaliation.** I also want to speak confidentially to the New York City Department of Education designated employee or representative for matters involving Title I of the Americans with Disabilities Act and grievances.

Please explain why New York City Department of Education and its employees are discriminating against me based upon a disability you are regarding me as having?  I am invoking my rights under the <u>Americans with Disabilities Act</u> as a qualified individual with a disability.

I am being regarded as having a contagious disease without any individualized assessment and continually being asked for my medical records and to submit to medical examinations and interventions (mitigation measures) without any informed consent.  It has been extremely difficult to perform my employment duties because of these interruptions and harassment.

Regarding the mitigation measures including but not limited to mask-wearing, vaccines, social distancing, hand-washing and submitting to medical examinations such as the collection of vital statistics (body temperature) or tissue samples (diagnostic testing), I am not required to accept these or any mitigation measures under Title I of the ADA, 29 CFR Part 1630.9(d). If you have some legal authority that overrides this, please provide me with a legal citation.

Title I of the ADA prohibits employers from requiring medical examinations or making disability-related inquiries of employees unless such examination or inquiry is shown to be job-related and consistent with business necessity; see, 42 U.S.C. §12112(d)(4); 29 CFR §1630.14(c)

My questions are:

1.  Why do you regard me as having a disability and what records have you made of this?

**2.  What physician, what medical records, and what complaint made by a physician to a health officer, and "orders of isolation and quarantine" do you rely upon for diagnosing me as having a contagious disease?  Please include all, evidence, court records and records from the individualized assessment used in making this determination or diagnosis as required under the New York Public Health Law (PHL) §2120(1)[1] and Title I of the Americans with Disabilities Act.[2]**

3.  Please identify the statute and regulation imposing your legal duty of care to protect me and others from any contagious disease and the commissioner's pertinent "hazard assessments".

4.  Please provide a copy of documentary evidence from the departments of health or labor establishing the existence of a disease that has been isolated by modern scientific standards and documentary evidence proving that such disease is airborne and contagious.

5.  Please identify your insurable risk with a copy of your insurance binder showing that you are insured for protecting employees from a contagious disease, and any adverse health consequences they may suffer as a result of your mitigation measures.

6.  Regarding the mitigation measures, **a)**  why have you refused to include notice that this is under an emergency use authorization, and disclose the risks and benefits of the product, and also advise me of my right to either accept or refuse the product,[3] and **b)**  which of these mitigation measures has the proven efficacy to prevent transmission or infection of the contagious disease for which you regard me as having?

7.  How are your requests for my medical information and submitting to medical examinations and interventions necessary for the performance of my employment duties?

8.  Why are you able to diagnose me with a deadly disease and impose restrictions and medical interventions without my informed consent, without any physician's oversight or judicial approval as re

infectious disease exposure prevention plan".[4] <u>On the other hand, if you refuse to answer these questions, I will consider the matter closed and we can set it aside and continue with our business without further interruption.</u>

Be advised that if my employment is conditioned upon submitting to your mitigation measures, this constitutes discrimination based upon disability, a violation of state and federal law, and retaliation under the ADA, for which I would have a claim for employment discrimination based upon disability.

Sincerely,

Stephen Donald Evans

**Please be advised that this communication and all related communications are confidential and must not be disclosed as per the Americans with Disabilities Act explained below.**

---

[4]New York Labor Law §218-b

### Post Script Memorandum of Law

Title I of the ADA, 42 U.S.C. § 12111, et seq., and its implementing regulation, 29 C.F.R. Part 1630, permits covered employers, such as New York City Department of Education, to make inquiries into the ability of an employee to perform job-related functions and make inquiries into the nature and severity of the employee's disability, so long as the examination is job-related and consistent with business necessity.  42 U.S.C. §§ 12112(d)(4)(A)–(B); 29 C.F.R. § 1630.14(c).  See also <u>Darby v. Childvine, Inc.</u> 964 F.3d 440 (2020)

Information obtained as a result of such an examination or inquiry regarding the medical condition or history of any employee must be treated as a confidential medical record.  42 U.S.C. §§ 12112(d)(4)(C), (d)(3)(B); 29 C.F.R. § 1630.14(c)(1).

Confidential medical information may be disclosed in three instances: (1) to inform supervisors or managers regarding necessary restrictions on the work of the employee and necessary accommodations, (2) to medical personnel when emergency treatment is required, and (3) to government officials investigating compliance with this regulation.  42 U.S.C. §§ 12112(d)(4)(C), (d)(3)(B); 29 C.F.R. § 1630.14(c)(1).  None of these exceptions apply with regard to my employment with New York City Department of Education.

**Addendum**

# DEMAND FOR RETRACTION

White House, Department of Justice

and Fox News, CNN, MSN, MSNBC

The White House and Department of Justice, via Jen Psaki, made a false and misleading statement in the White House press briefing dated July 6th, 2021.[5]

Demand is made the White House and Department of Justice and all news agencies to retract its false statement:

> **"Section 564(e)(1)(A)(ii)(III) of the Food, Drug, and Cosmetic Act concerns only the provision of information to potential vaccine recipients and does not prohibit public or private entities from imposing vaccination requirements for a vaccine that is subject to an emergency use authorization."**

and the same demand for retraction of the false and misleading title from the article published by Fox News dba Fox TV Digital Team, CNN, MSN, MSNBC and all news agencies that published the following statement in any way:

> **"Federal law doesn't prohibit COVID-19 vaccine mandates"**

and all commentary supporting this statement, and correct this false statement with the complete opinion which the Department of justice failed to include, which states:

> "Whether Section 564 of the Food, Drug and Cosmetic Act Prohibits Entities from Requiring the Use of a Vaccine Subject to an Emergency Use Authorization."[6]

> **"We do not address whether other federal, state, or local laws or regulations, such as the Americans with Disabilities Act ("ADA"), might restrict the ability of public or private entities to adopt particular vaccination policies.** See, e.g., Equal Employment Opportunity Commission, What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws (updated June 28, 2021), https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws (discussing the ADA)."[7]

Demand is made upon the White House, Department of Justice and all news media agencies to retract its false and misleading statements and publish a correction by disclosing its complete and accurate opinion and to correct this in the same manner in which the false and misleading statement was first made (not on the back page of some newspaper).

These false and misleading statements create a danger and public health hazard by encouraging private businesses and government agencies to violate the law. This is the way the government can push its agenda and avoid being challenged, by distributing a policy to literally millions of locations instead of adopting an actual law, it can mislead millions of people into making the wrong conclusions, an din many cases, result in the death or permanent injury of many thousands or millions of people.

---

[5] https://rumble.com/embed/vhso17/?pub=mt1mb
[6] 21 USC §360bbb-3
[7] https://www.justice.gov/sites/default/files/opinions/attachments/2021/07/26/2021-07-06-mand-vax.pdf

*A-8*

**DOE Vaccination Portal**

NYCDOE <noreply@schools.nyc.gov>
Wed 9/22/2021 3:32 PM
To: Evans Stephen <SEvans5@schools.nyc.gov>



Dear Colleague,

You are receiving this e-mail because our records indicate that you have not yet submitted proof of COVID-19 vaccination (at least one dose) to the <u>DOE Vaccination Portal</u>.  **The deadline to upload this information is September 27th.**

To correct this issue, go to the <u>DOE Vaccine Portal</u> to upload documentation of least one vaccine dose today. Proof of vaccination can be an image of your vaccination card, NYS Excelsior Pass, or other government record. You are also expected to receive your 2nd dose within 45 days of the first dose to remain compliant, according to the order issued by the Commissioner of Health.

This information will be kept confidential in accordance with federal, state, and local laws. If you encounter technical issues using the Vaccination Portal, please contact the DOE Help Desk by <u>opening a ticket online</u> or calling 718-935-5100.

For more information on the Vaccine Mandate, please visit the <u>COVID-19 Vaccination Portal</u> Infohub webpage. For more information about where to get vaccinated, please visit <u>vaccinefinder.nyc.gov</u> or call 877-VAX-4-NYC.

Sincerely,

Vaccine Portal Team

A-9



**From:** Michael Mulgrew, UFT President noreply@uftmail.org
**Subject:** Arbitrator rules in union's favor on medical accommodations
**Date:** September 10, 2021 at 6:51 PM
**To:** mistersevans@gmail.com

View Online

Your Rights     Your Benefits     **Your Union**

Dear Stephen,

An independent arbitrator has upheld the union's position and ruled that the city must offer work outside school buildings to immunocompromised members who — even vaccinated — are at high risk of contracting serious illness from a COVID-19 infection.

In the arbitration proceeding, the city was also forced to back off its original plans to offer no exemptions for those unable to take the vaccine for medical or religious reasons.

See the arbitrator's order »

The online application form for a medical accommodation or an exemption will go live on SOLAS on Monday, Sept. 13. UFT members will have until Monday, Sept. 20, to apply.

The city has also agreed — based on the arbitrator's determination — that other UFT members who decline to be vaccinated may go on unpaid leave or take severance, both with a year's health coverage.

We were also able to secure an early-leave provision for women in their third trimester of pregnancy.

The city's vaccine mandate goes into effect on Monday, Sept. 27. All DOE-employed UFT members who do not qualify for an accommodation or exemption must have at least one dose of the vaccine by then.

Medical accommodations

Vaccinated UFT members with weakened immune systems due to a documented

medical condition may apply via SOLAS for medical accommodation. These requests must be documented in writing by a medical doctor.

If the accommodation is approved, the immunocompromised member must be offered work in a non-school building as long as their medical condition lasts.

## Medical exemptions

Permanent medical exemptions to the vaccine mandate will only be considered where the individual has a documented allergic reaction such that the member cannot receive any of the three authorized vaccines.

Temporary medical exemptions to delay the vaccine will be granted when:

- Within the isolation period after a positive COVID diagnosis
- Within 90 days of monoclonal antibody treatment of COVID-19
- Conditions that may warrant temporary medical exemption because of active therapy or treatment, such as chemotherapy, stem cell transplant, CAR T-cell therapy.
- Pericarditis or myocarditis

These requests must be documented in writing by a doctor.

In cases where members seek exemptions for medical conditions not on the above list, an independent arbitrator will decide if the exemption is appropriate.

If denied, the member will have one school day to file a notice of appeal. An independent arbitrator will promptly review the appeal — and convene a hearing if necessary — before issuing a final determination. During the appeal process, the member will be temporarily granted the exemption and kept on payroll.

## Religious exemptions

Exemption requests will be considered for recognized and established religious organizations and not where the objection is personal, political or philosophical in nature. Applications for religious exemptions must be documented in writing by clergy or a religious official.

Appeals of religious exemption denials will be heard by the same independent

arbitrators ruling on medical exemption appeals. During the appeal process, the member will be temporarily granted the exemption and kept on payroll.

## Members in their last trimester of pregnancy

UFT members in their last trimester of pregnancy, whether vaccinated or not, have the option to go on leave immediately.

- First, members must exhaust their CAR days.
- If the member exhausts their CAR days before giving birth, the member can decide to start the six weeks of paid parental leave (if eligible) early.

Members in their first two trimesters of pregnancy must be vaccinated if they want to remain on payroll.

The UFT has organized a special virtual information session on Tuesday, Sept. 14, at 5 p.m. for members in their third trimester. Register now »

## Options for all other UFT members

Members who are not vaccinated by Sept. 27 but do not qualify for a medical accommodation or an exemption must be offered two options, both of which include one year's health coverage:

### 1. Unpaid leave option:

UFT members may go on an official unpaid leave for up to one school year. The departure will be deemed involuntary and nondisciplinary for unemployment insurance purposes. The member cannot take other paid employment during this leave. They will continue to receive city health insurance through Sept. 5, 2022, as long as they do not take a job elsewhere. Their job will be held at their school for this period, too.

If at any time prior to Sept. 5, 2022, the member takes the vaccine, the member may return to work.

On Sept. 5, if the city's vaccine mandate remains in effect and the individual remains unvaccinated, the person will be automatically deemed voluntarily resigned.

These members must either get vaccinated or extend their leave by Nov.

30. Otherwise, they will be subject to disciplinary action.

## 2. Severance option:

Members who resign will be able to exchange their CAR days in their bank 1-for-1 up to 100 days (under ordinary circumstances, it is 2-for-1), though this time is not pensionable. They will also receive medical insurance for one year as long as they do not have access to other insurance coverage during that period.

Unvaccinated UFT members have until Oct. 29 to choose the severance option. Those who take this option do not have a right of return to their school, but they will not be prevented from seeking DOE employment in the future.

## MLC lawsuit continues

The arbitrator's ruling does not resolve the underlying issue of whether the city Department of Health has the legal authority to require that DOE and other employees be vaccinated. Only the courts can determine the legality of the mandate.

The Municipal Labor Committee, of which the UFT is a member, filed a lawsuit challenging the mandate in state court this week. The UFT remains a party to that lawsuit.

Sincerely,

Michael Mulgrew
UFT President

This email was sent to: mistersevans@gmail.com

Preferences   |   Unsubscribe   |   Privacy Policy

©2021 United Federation of Teachers All Rights Reserved

*A-10*

**From:** Gentile Robert <RGentil@schools.nyc.gov>
**Sent:** Friday, September 10, 2021 4:45 PM


**Subject:** Weekly Calendar

Weekly Calendar Sep 13-17 2021.pdf
Gentile Robert
Fri 9/10/2021 4:45 PM




<< Weekly Calendar Sep 13-17 2021.pdf >>
**Quote of the Week: "No day shall erase you from the memory of time." Virgil**





**Please note that the *Weekly Calendar* is the weekly correspondence from the Principal to the staff. There are others included (Cced) on the email. When you reply all, please consider whether these folks need to have the message you are sending and edit contacts appropriately.**
Colleagues,

Let me begin by thanking everyone for the great work, conversations and collaborations you engaged in over the past two days. I am sure these days helped many of us get our legs back under us after being out of the building for so long. Our students will need the same time, maybe longer, to get back into the swing of being in our physical school building. Use next week to welcome your students into your classrooms. Do your best to help them feel comfortable. We want our students to feel safe, affirmed, and be ready to engage in joyful learning experiences. I hope that many of you will join me and the administrative team in the lobby on Monday morning to welcome our students back to school.

Tomorrow is the 20th anniversary of the September 11th terrorist attacks on the twin towers, the Pentagon and on the plane that crashed near Shanksville, Pennsylvania. With all the conversations we were engaged in the past two days this may have slipped our minds. I think it is important to remember the nearly 3,000 Americans who lost their lives and how that brutal act still reverberates with us today. I hope, at least in Social Studies classes, we find some time to discuss this critical event in US History next week.

Have a great weekend everyone, again, thank you for being present these two days. Let's make Monday the best *Homecoming* in the city for our students.

Robert

## NEW ITEM(S):
## HEALTH SCREENING SURVEY
The DOE has developed a health-screening tool, which you can add and complete on your phone daily. Please see below for directions to add the tool to your phone.

1.    On your phone, go to https://healthscreening.schools.nyc/
2.    Click on "Add this tool to your phone"
3.    Select appropriate phone
4.    Follow remaining directions

After adding the tool to your phone, you will need your DOE username and password to complete the screening. **It is quick and must be taken each day before arrival.** You will get a confirmation on the screen as well as one sent to your DOE email. You will need to show your confirmation to the safety agent or screening personnel upon your arrival to the building.

## VACCINE PORTAL
All DOE employees must submitted proof of COVID-19 vaccination (at least one dose) to the DOE Vaccination Portal.  The deadline to upload this information is Monday, September 27th. Proof of vaccination can be

an image of your vaccination card, NYS Excelsior Pass, or other government record. You are also expected to receive your 2nd dose within 45 days of the first dose to remain compliant, according to the order issued by the Commissioner of Health.
For more information about where to get
vaccinated, please visit vaccinefinder.nyc.gov or call 877- VAX-4-NYC.

**Here is the link to the Vaccination Portal**: https:// vaccine.schools.nyc/

Robert A. Gentile, Principal
The High School for Health Professions & Human Services
345 East 15th Street
New York, New York 10003
Tel:(212)780-9175 Ext. 2102
Fax:(212)979-7261

*A-11*



**From:** **Sebastian Natera** naterauft@gmail.com
**Subject:** Chapter Update 9/13/2: last day to grieve schedules, Mulgrew's emails, Student mask discipline code, and first day back
**Date:** September 13, 2021 at 10:55 AM
**To:** Natera, Sebastian naterauft@gmail.com, Alice O'Neil Aoneil@uft.org, Geoffrey Orens orensuft@gmail.com
**Bcc:** mistersevans@gmail.com

1. Arbitration on vaccination
2. Class size
3. Be gentle with them
4. Students with masks
5. Suggestion for mask break in the hall

Hey all,

First off, good news: the UFT calendars are in 420!

Today is the last to grieve any issues with schedules. Send them to me ASAP.

I need to know if you have any oversize classes. Today is the first day of class, and I need to follow a grievance procedure to make sure that classes get normalized in a timely manner.

We got two emails from Mulgrew, "**Agreement on school reopening protocols and procedures**" and "**Arbitrator rules in union's favor on medical accommodations** on 9/12 and 9/10, respectively. Let me know if you didn't get the emails.

The good news from Friday's email is that those who refuse to get the vaccination can either cash out their CAR days and find something else to do with their lives or stay home and quarantine with full medical coverage. I'm pretty happy to know that those who ascribe to the pathological view that spreading disease is a civil right literally worth dying for can now be kept from being a danger to the school community.

The highlight of the email that was sent out last night was that there are serious repercussions if students refuse to wear a mask.

---

### Consequences for students who refuse to wear a mask

Last year, when a student refused to wear a mask, the school could assign that student to remote learning. This year, since there is no longer a remote option for healthy students, we needed to bargain over the consequences of noncompliance.

If a student refuses to wear a mask, here is how staff should respond:

1. The school must document the incident in OORS
2. Teacher speaks with student
3. Student is sent to school counselor
4. Student is sent to the administration
5. Parent is called to pick up the student

If the student continues to refuse to wear a mask at school, the student will receive up to a five-day principal suspension. Continued noncompliance or a second infraction will result in a 10-day superintendent suspension. During these suspensions, the student will receive

remote instruction.

If a student continues to refuse to wear a mask, the superintendent suspension will be extended and a school may apply to exclude the student from school.

Students with significant documented disabilities will be given supports to help with mask wearing and may be allowed a mask break in a well-ventilated area that allows for six feet of distancing.

The refusal to wear a mask is a serious violation of the student discipline code that puts the school community at risk. If your school is not following this protocol, reach out to your school's COVID-19 building response team and your chapter leader or call the UFT safety hotline at 212-331-6317.

I am suggesting that all of you should incorporate something from this into your syllabus.

A word on our students.  We all know that they have been through a lot.  Let's give them an opportunity to share their identities in class, especially since they can't share their faces. Please do your best to not slam them, at least, not right away.

As far as a mask break is concerned, the best suggestion I have seen is, during your class, let students step into the hall for 5 minutes to remove their mask and breath.  During class times, the halls should be mostly empty, and the kids should be able to breath much better.  I know, if we let kids in the hall during class, the halls may get crowded, and some may abuse the privilege.  I get it, but we need something that works, so, if you have a better suggestion, please share it with me.

In Solidarity,


Sebastian Natera

Chapter Leader of HPHS

917 574 3504

A-12

Stephen Donald Evans
90 Beekman Street, #6C
New York, NY 10038

Adam Clayton Powell Jr. State Office Bldg.
163 West 125th Street, 4th Floor
New York, NY 10027
212-961-8650

September 16, 2021

Re      Employment Discrimination and Retaliation

My employer regards me as having a disability.

My employer has made a record of such disability.

My employer has failed to conduct any individualized assessment to determine if I am a direct threat to anyone.  My employer has failed to engage in any interactive process with me concerning disability rights or resolutions.

I have asked to speak confidentially with my employer's designated employee or representative that is responsible for resolving matters involving  the Americans  with Disabilities Act and and grievances thereunder, but my employer refuses to provide me access to such a person.

Instead, my employer has offered various accommodation measures including but not limited to mask-wearing, staying six feet away from others, frequent hand-washing, collection, use and storage of my vital statistics, histological samples and biometric data and biometric identifiers without adequate or proper notice, adequate disclosures, adequate data retention security or my informed consent, working in isolation, video-graphic and audio-graphic communications in lieu of face to face communications, working behind clear shielding, and injections of certain types of suspensions which are being called "vaccinations" yet do not prevent infection or transmission of any contagious disease and in fact create more disabilities by altering the normal function of my immune system and other cellular functions. My employer has not merely "offered" such accommodation measures, but threatened me with penalties including those described herein for refusing such accommodations in  violation of 29 CFR Part 1630.9(d).

I have thereby informed my employer that I am a qualified individual with a disability that substantially limits my ability to engage in one or more major life activities.

My employer asked me to describe my disability and discuss it with certain employees, even though such disability does not adversely affect my ability to perform the duties of my employment, and has done so without any offer or attempt to make such disclosures in confidence or privately.

I have requested information regarding the risks and benefits of my employers accommodation measures and in response, my employer has retaliated against me by humiliating me in  front  of others, by reprimanding me and has threatened or intimidated or

coerced me with the threat of suspension of my pay, reduced hours or pay or the termination of my employment for refusing such accommodation measures instead of providing me with the information I requested so that I could make an informed decision.

I have exercised my right to refuse such accommodation measures and proposed instead that I be permitted to perform my employment duties without harassment, retaliation, coercion or intimidation as a result of my exercise of such rights, and my employer has prevented and interfered with this occurring.

I have not requested reasonable modifications but only that I be permitted to perform my employment duties without harassment, retaliation, coercion or intimidation.

My employer has instead retaliated against me for exercising my rights under the Americans with Disabilities Act by threatening me with disciplinary measures and penalties for refusing such accommodation measures, including but not limited to suspension or reduction of pay, limiting my access to the premises where I work, segregation, isolation, termination of employment, exclusion from programs or services that would permit me to improve my employment skills or become eligible for advancement, and denied me the possibility for promotion even when I was eligible or would become eligible.

Each day my employer permits and encourages other employees, including my supervisor and managers to harass and intimidate me and ask me for medical, health and other personal information that does not pertain to, or is not necessary for, the performance of my employment duties.

My employer has written and adopted policies that exacerbate my disabilities and create disabilities while also encouraging others to retaliate against me for exercising my rights under the Americans with Disabilities Act.

My employer has failed or refused to fulfill its duty to aid and encourage me in the exercise of my rights which are protected under the Americans with Disabilities Act.

My employer has demonstrated by the actions of its employees and by its own written policies that it intends to continue such violations and failures to comply with the law and violation my rights.

Sincerely,

Stephen Evans

A-13

REVISED 5/99

# The City of New York — EMPLOYEE — Payroll Management System

## DIRECT DEPOSIT PAY STATEMENT

| ITEM # | PAY PERIOD | PAYDATE | | | PAYROLL # | WORK UNIT | CHECK NUMBER | DISTRIBUTION # |
|---|---|---|---|---|---|---|---|---|
| | 09/16/21 | 09/30/21 | 09/30/21 | | 742 | Z68818086 | | 02M420 |

ELECTRONIC FUND TRANSFER INFORMATION

| PENSION # | | | | REFERENCE # | CD | EMPLOYEE NAME |
|---|---|---|---|---|---|---|
| 807841 | | | | 1021538 | | EVANS, STEPHEN D |
| TAX INFO | | | | | | |
| | XXXX3673 | | | | | |

| | THIS PERIOD | FEDERAL TAX | SOCIAL SECURITY | MEDICARE | STATE TAX | CITY TAX | CITY WAIVER | TOTAL DEDUCTIONS THIS PERIOD |
|---|---|---|---|---|---|---|---|---|
| TOTAL EARNINGS | | | | | | | | |
| THIS PERIOD | 3,645.08 | 428.18 | 226.00 | 52.85 | 145.87 | 102.00 | | 2,622.55 |
| YEAR TO DATE | 81,174.98 | 10,425.19 | 5,025.05 | 1,175.22 | 3,411.73 | 2,560.82 | | NET PAY |

| | | | | | SSN | FED MARITAL STATUS | STATE MARITAL STATUS | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 1 | A 0 | A 0 | | | | |

RECURRING GROS

| DESCRIPTION | UNITS / HOUR | AMT. EARNED PRIOR PERIOD | UNITS / HOUR | AMT. EARNED THIS PERIOD | LEAVE BALANCE AS OF: 09/30/21 | | |
|---|---|---|---|---|---|---|---|
| UNAUTH ABSENCE | | | | -694.30 | | | 1,022.53 |

| DESCRIPTION | | | | DESCRIPTION | BALANCE AVAILABLE H-H M-M | DESCRIPTION | BALANCE AVAILABLE H-H M-M |
|---|---|---|---|---|---|---|---|
| | | | 4,339.38 | UNAUTH ABS | 0  0 | SELF-SICK | 0  0 |
| | | | | CAR TOTAL | 75  4:21 | | 0  0 |

Note: Leave Balances are based on the most current data from the Cummulative
Absence Reserve screen in EIS. Data is based on Pay Stub printing date

| DESCRIPTION | AMOUNT THIS PERIOD | GOAL AMOUNT OR TOTAL INSTALLMENT NO. | REMAINDER / EPA | DESCRIPTION | AMOUNT THIS PERIOD | GOAL AMOUNT OR TOTAL INSTALLMENT NO. | REMAINDER / EPA |
|---|---|---|---|---|---|---|---|
| UFT | -63.81 | | | COMP PLAN 457-R | -874.82 | | |
| TRS TDA | -729.02 | 19,500.00 | 3,292.39 | | | | |

Pay stub printed on 09/30/21

12/2/21, 2:27 PM

A-14

**FINAL NOTICE: Leave Without Pay Status**

NYCDOE <noreply@schools.nyc.gov>
Mon 11/29/2021 5:53 PM
To: Evans Stephen <SEvans5@schools.nyc.gov>

Image did not load.

Dear Colleague,

According to New York City Department of Education (NYCDOE) records, you are currently on a Leave Without Pay (LWOP) because you are not eligible to work based on your failure to comply with the New York City Health Commissioner's Order requiring vaccination of all NYCDOE staff, absent the granting of a reasonable accommodation.

As you were previously advised, **if you remain non-compliant and have not opted to extend your LWOP or return from LWOP status by November 30, you are subject to termination from service with the NYCDOE beginning December 1, 2021**.

If you would like to extend your LWOP status, you may do so by logging into SOLAS and stating your intention **by 11:59pm November 30**. Employees choosing this option:

- Will remain eligible for health insurance through September 5, 2022.
- May seek to return from this leave prior to September 6, 2022 by following the steps below on returning from LWOP status. Employees who have not returned by September 6, 2022 shall be deemed to have voluntarily resigned.
- Must waive their rights to challenge such resignation, including, but not limited to, through a contractual or statutory disciplinary process

If you would like to return to work from LWOP status, you must complete two steps using the DOE Vaccination Portal by November 30:

1. Upload proof that you have received your first dose of a COVID-19 vaccine. Proof of COVID-19 vaccine can be an image of your vaccination card, NYS Excelsior Pass, or another government record.

12/2/21, 2:27 PM

2.  E-sign the attestation stating that you are willing to return to your worksite within fourteen
    calendar days of submission.

    Once you have completed these two steps, your HR Director and supervisor will also be
    notified and will work with you to plan your return date.  If you encounter technical issues
    accessing the Vaccination Portal, please contact the DOE Help Desk by opening a ticket online
    or calling 718-935-5100. If you need support uploading your proof of vaccination, please
    contact your principal or HRD, who can do so on your behalf.

If you believe you have received this notice in error because you are not currently on leave without
pay, or have extended your LWOP, or have submitted proof of vaccination, please contact
**lwopquestions@schools.nyc.gov** no later than 5 PM on November 30, 2021.


Sincerely,


NYCDOE Division of Human Capital

*A-15*

## February 11 Termination of Employment from the NYCDOE

Division of Human Resources <DHR@schools.nyc.gov>
Mon 1/31/2022 3:17 PM
Dear DOE Employee,

You have previously received notice regarding your failure to comply with the New York City Health Commissioner's Order requiring vaccination of all New York City Department of Education staff. Compliance with that Order is a condition of employment. Since you have not complied with the Order and have not chosen to extend your leave without pay, despite notice and an opportunity to do so, your employment with the New York City Department of Education is terminated, effective February 11, 2022. Please note that your health insurance coverage through the City will also cease upon termination.

You must return all DOE-issued equipment and materials, including your ID, to your supervisor. Information about COBRA will be mailed separately to you at the address on file in NYCAPS. Your school and/or office will be notified of your termination as well.

If you believe you are receiving this notification in error, please email LWOPquestions@schools.nyc.gov no later than February 2, 2022.

Thank you for your service to the New York City Department of Education.

Sincerely,

NYCDOE Division of Human Resources

A-16

## Termination of NYCDOE Employment

Division of Human Resources <DHR@schools.nyc.gov>
Tue 2/15/2022 3:22 PM
To: Evans Stephen <SEvans5@schools.nyc.gov>


February 15, 2022

STEPHEN EVANS
TEACHER
1021538

Dear STEPHEN EVANS:

You have previously received notice regarding your failure to comply with the New York City Health Commissioner's Order requiring vaccination of all NYCDOE staff and your termination from DOE effective February 11, 2022 as a result.  Compliance with that Order is a condition of employment. Since you did not comply with the Order and did not choose to extend your leave without pay, despite notice and an opportunity to do so, your employment with the New York City Department of Education was terminated, effective February 11, 2022. Please note that your health insurance coverage through the City also ceased upon termination.

If you have not already done so, you must return all DOE-issued equipment and materials, including your ID, to your supervisor. Information about COBRA will be mailed separately to you at the address on file in NYCAPS. Your school and/or office will be notified of your termination as well.


Thank you for your service to the New York City Department of Education.

Sincerely,


NYCDOE Division of Human Capital



A-17



## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

New York District Office
33 Whitehall St, 5th Floor
New York, NY 10004
(929) 506-5270
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161 & 161-A)

Issued On: 06/07/2022

**To:** Stephen Evans
107-81 100 Street
Ozone Park, NY 11417
Charge No: 16G-2021-02881

EEOC Representative and email:     Holly Shabazz
S/L Program Manager
Holly.Shabazz@EEOC.gov

---

### DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

The EEOC has adopted the findings of the state or local fair employment practices agency that investigated your charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission,

Digitally Signed By:Judy Keenan
06/07/2022
_____
Judy Keenan
District Director

Cc:
City of New York
Dept of Education
Office of the General Counsel
52 Chambers Street-Room 308
New York, NY 10007


Please retain this notice for your records.

Enclosure with EEOC Notice of Closure and Rights (01/22)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to: https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a FOIA Request or 2) a Section 83 request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your request for the charge file promptly to allow sufficient time for EEOC to respond and for your review. Submit a signed written request stating it is a "FOIA Request" or a "Section 83 Request" for Charge Number 16G-2021-02881 to the District Director at Judy Keenan, 33 Whitehall St 5th Floor

New York, NY 10004.

You can also make a FOIA request online at https://eeoc.arkcase.com/foia/portal/login.

You may request the charge file up to 90 days after receiving this Notice of Right to Sue.  After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA Requests and Section 83 Requests, go to: https://www.eeoc.gov/eeoc/foia/index.cfm.

### NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA)

The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at: http://www.eeoc.gov/laws/types/disability_regulations.cfm.

**"Actual" disability or a "record of" a disability**

If you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability:

- ✓ **The limitations from the impairment no longer must be severe or significant** for the impairment to be considered substantially limiting.

- ✓ In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities" now include the operation of major bodily functions**, such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system.

- ✓ **Only one** major life activity need be substantially limited.

- ✓ Except for ordinary eyeglasses or contact lenses, the beneficial effects of **"mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications) **are not considered** in determining if the impairment substantially limits a major life activity.

- ✓ An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or "**in remission**" (e.g., cancer) is a disability if it **would be substantially limiting when active**.

- ✓ An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months**.

Enclosure with EEOC Notice of Closure and Rights (01/22)

**"Regarded as" coverage**

An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).

- ✓ "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.

- ✓ The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively **both** transitory (lasting or expected to last six months or less) **and** minor.

- ✓ A person is not able to bring a failure to accommodate claim **if** the individual is covered only under the "regarded as" definition of "disability".

***Note:*** *Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment. Beyond the initial pleading stage, some courts will require specific evidence to establish disability.* For moreinformation, consult the amended regulations and appendix, as well as explanatory publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.



U.S. Courthouse
500 Pearl Street
New York, NY 10007

RECEIVED
SDNY PRO SE OFFICE
2022 SEP 13 PM 3:26

RECEIVED
CLERK'S OFFICE
SEP 08 2022
S.D.N.Y.